Guy B. Wallace (SBN 176151)
gwallace@schneiderwallace.com
Mark T. Johnson (SBN 076904)
mjohnson@schneiderwallace.com
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105

Linda M. Dardarian (SBN 131001)
ldardarian@gbdhlegal.com
Andrew P. Lee (SBN 245903)
alee@gbdhlegal.com
GOLDSTEIN, BORGEN,
DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612-3536
Telephone: (510) 763-9800
Facsimile: (510) 835-1417

Catherine Cabalo (SBN 248198)
ccabalo@peifferwolf.com
PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP
4 Embarcadero Center, 14th Floor
San Francisco, CA 94104
Telephone: (415) 766-3592
Facsimile: (415) 402-0058

Jinny Kim (SBN 208953)
jkim@dralegal.org
Rosa Lee Bichell (SBN 331530)
rbichell@dralegal.org
DISABILITY RIGHTS
ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704
Telephone: (510) 665-8644
Facsimile: (510) 665-8511

Attorneys for the Plaintiffs and the Proposed Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| MICHAEL CURRAN, NICOLE BROWN-BOOKER, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>          vs.<br><br> CITY OF OAKLAND,<br><br>                    Defendant. | Case No: <br><br>CLASS ACTION<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:**<br><br>1. Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12131, *et seq.*)<br>2. Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794, *et. seq.*)<br>3. California Gov't Code § 11135, *et seq*. |

**INTRODUCTION**

1.      Plaintiffs bring this action on behalf of themselves and a proposed class of similarly situated persons with mobility disabilities to redress the systemic and pervasive discrimination against them and members of the proposed class by the City of Oakland (hereafter "the City" or "Defendant").  Specifically, through the policies and practices described herein, Defendant has denied persons with mobility disabilities full and equal access to the City's pedestrian rights of way, including sidewalks, curb ramps, crosswalks, pedestrian crossings and other public walkways within the boundaries of the City (hereafter "pedestrian rights of way"). These public facilities are owned, operated or controlled by the City, and are characterized by multiple, pervasive and hazardous disability access barriers.  By its conduct, Defendant has violated Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12131, *et seq.*) ("ADA"), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §§ 794, *et seq.*) ("Section 504"), California Government Code §§ 11135, *et seq.* ("Cal. Govt. Code § 11135"), and their implementing regulations.  Plaintiffs seek and are entitled to declaratory and injunctive relief prohibiting such continued discrimination.

2.      At all times relevant to this action, Defendant has engaged in the following discriminatory and illegal policies and practices with respect to the pedestrian right of way and persons with mobility disabilities:

a.      Constructing sidewalks, curb ramps, crosswalks and other elements of the pedestrian right of way that do not comply with applicable federal or state disability access standards including, *inter alia*, the 2010 Americans with Disabilities Act Standards for Accessible Design ("2010 ADAS"), the 1991 Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), the Uniform Federal Accessibility Standards ("UFAS") and the applicable iteration of the California Building Code ("CBC").

b.      Altering or repairing sidewalks, curb ramps, crosswalks and other elements of the pedestrian right of way in a manner that fails to comply with federal and state access standards, including 2010 ADAS, ADAAG, UFAS and/or the CBC.

c.   Allowing the construction or alteration by other entities of sidewalks, curb ramps, crosswalks and other elements of the pedestrian right of way in a manner that fails to comply with applicable federal and state disability access standards, including *inter alia*, the 2010 ADAS, ADAAG and/or the CBC.

d.   With respect to intersections on streets that are resurfaced or otherwise altered or newly constructed, failing to install curb ramps at those locations that comply with applicable federal and state disability access standards, as required by federal and state law.

e.   Failing to maintain its pedestrian rights of way in a condition that is readily accessible to persons with mobility disabilities by preventing or eliminating access barriers caused by damaged or deteriorated sidewalks, curb ramps, cross walks and other elements of the pedestrian right of way, as required by federal and state law.

f.   With respect to newly constructed curb ramps, failing to utilize or require the utilization of designs that comply with federal and state accessibility standards, including the 2010 ADAS, ADAAG, UFAS and/or the CBC.

g.   Failing to remediate newly constructed or altered sidewalks, curb ramps, streets or other elements of the pedestrian right of way that do not comply with federal and/or state accessibility standards as required by 28 C.F.R. § 35.151(c)(5) and California Government Code § 4452.

h.   Failing to adopt, implement or enforce ordinances or other requirements necessary to ensure that pedestrian rights of way are kept free of temporary or permanent obstructions resulting in access barriers for people with mobility disabilities.

i.   Failing to ensure the remediation of mid-block access barriers on sidewalks and other pedestrian walkways including, *inter alia*, broken, cracked, crumbled, steep, sunken, uneven or otherwise inaccessible surfaces, as well as obstacles placed in the path of travel, such as bus stop benches, utility boxes, or light poles, when necessary to provide access to the pedestrian rights of way.

j.    Failing to adopt or implement any adequate policy or procedure for inspecting, repairing and maintaining the pedestrian rights of way so that they are readily accessible to persons with mobility disabilities.

3.    As a result of the above policies and practices and Defendant's acts and omissions alleged herein, the City's pedestrian rights of way are characterized by numerous physical access barriers to persons with mobility disabilities, including but not limited to the following:

a.    Missing, unsafe and/or inaccessible curb ramps that do not comply with federal and/or state access standards (*e.g.*, slopes too steep, hazardous cross-slopes, curb ramp lips);

b.    Pedestrian rights of way that are cracked, crumbled, steep, sunken, or uneven or that have excessive slopes or broken and inaccessible surfaces; and,

c.    Physical obstacles on the sidewalk between intersections, such as improperly placed signs, poles, trash receptacles, utility boxes, and bus stop benches.

4.    Defendant has constructed, caused and/or failed to remediate or eliminate these barriers.  As a result of Defendant's discriminatory conduct, Plaintiffs and the members of the putative class have been injured.  Specifically, Plaintiffs and the members of the putative class have been denied full and equal access to the City's pedestrian rights of way as required by federal and state law.

5.    The inaccessibility of the City's pedestrian right of way results in Plaintiffs and the members of the putative class being denied full and equal access to places of public accommodation, places of employment, and other places to which the general public is invited. Further, the inaccessibility of the City's pedestrian right of way contributes to the isolation and segregation of persons with mobility disabilities by making it impossible or more difficult for them to visit or socialize with family members and friends.  Moreover, as a result of Defendant's discriminatory conduct as alleged herein, Plaintiffs and the members of the putative class are forced to struggle with access barriers in the City's pedestrian rights of way on a daily basis, resulting in fatigue, physical injury, emotional distress, and/or damage to wheelchairs and other mobility devices.

6.     The lack of access to the City's system of pedestrian rights of way and the existence of access barriers therein deprives people with mobility disabilities of their independence, prevents them from traveling throughout the City without difficulty and essentially relegates them to second-class citizen status.  The injuries alleged herein are ongoing, and Plaintiffs and the members of the putative class are certain to face the imminent threat of further injuries including the denial of full and equal access to the City's pedestrian rights of way, struggling with access barriers, physical exhaustion and injuries (including the risk of death from being forced to roll in the street with cars and buses because of missing curb ramps), as well as isolation, segregation, humiliation, hardship, anxiety, indignity and embarrassment.

7.     The discrimination and denial of full and equal access to Defendant's pedestrian rights of way for persons with mobility disabilities complained of herein are the direct result of Defendant's policies and practices with regard to the City's pedestrian walkways and disability access.  These policies and practices, or lack thereof, have resulted in discrimination against persons with disabilities in the form of denial of access to the City's pedestrian rights of way that manifests in common ways throughout the City.  Substantial portions of the City's more than one-thousand miles of sidewalks do not comply with federal and state access standards and are in need of repair.

8.     The accessibility of pedestrian rights of way to persons with mobility disabilities goes to the heart of the purpose of the ADA and other disability rights laws, including providing full and equal access to public facilities, as well as promoting independence and social and economic integration for persons with disabilities.  Defendant provides and is responsible for maintaining these public pedestrian rights of way, which constitute essential public facilities for residents and visitors alike.  Yet this system of pedestrian rights of way is not accessible to persons with mobility disabilities in violation of the ADA, Section 504 and Cal. Govt. Code § 11135.  This lawsuit seeks to require Defendant to comply with these critical federal and state civil rights laws.  By its conduct as alleged herein, Defendant harmed and continues to harm people with mobility disabilities by Defendant's unlawful conduct in failing to make its pedestrian rights of way accessible as required by federal and state law.

9.      Plaintiffs seek declaratory and injunctive relief against Defendant for violating the ADA, Section 504 and Cal. Govt. Code § 11135 and their accompanying regulations, as well as an award of reasonable attorneys' fees, litigation expenses, and costs under applicable law. Plaintiffs have no adequate remedy at law, and unless Defendant is preliminarily and permanently enjoined, Plaintiffs will continue to suffer irreparable harm as a result of being denied full and equal access to these public facilities.  In addition, the named Plaintiffs seek compensatory damages on an individual basis pursuant to the ADA, as Defendant has acted with deliberate indifference to the named Plaintiffs' federally protected civil rights.

**JURISDICTION AND VENUE**

10.     The first two claims alleged herein arise under the ADA and Section 504, such that the jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.  Through the same actions and omissions that form the basis of Plaintiffs' federal claims, Defendant has also violated Plaintiffs' rights under state law, over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  This Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

11.     Venue over Plaintiffs' claims is proper in the Northern District of California because Defendant is located in the Northern District of California within the meaning of 28 U.S.C. § 1391, and because the events, acts, and omissions giving rise to Plaintiffs' claims occurred in the Northern District of California.

**INTRADISTRICT ASSIGNMENT**

12.     Assignment of this action to the United Stated District Court for the Northern District of California, San Francisco Division or Oakland Division, is proper pursuant to Civil L.R. 3-2(c) because these civil claims arose in the County of Alameda.

**PARTIES**

13.     Named Plaintiff Michael Curran is a resident of Oakland who is paraplegic and uses a manual wheelchair for mobility.  Plaintiff Curran is a "qualified person with a disability" and a person with "a disability" within the meaning of all applicable statutes and regulations including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, 29 U.S.C. § 705(20)(B), and California

1    Government Code § 12926.

2        14.    Named Plaintiff Nicole Brown-Booker is a resident of Oakland who was

3    diagnosed with Rheumatoid Arthritis at age two and is unable to walk on her own due to loss of

4    cartilage, reduced bone growth, extreme inflammation and joint damage caused by that

5    condition.  She uses a power wheelchair on a daily basis for mobility.  Plaintiff Brown-Booker is

6    a "qualified person with a disability" and a person with "a disability" within the meaning of all

7    applicable statutes and regulations including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, 29

8    U.S.C.§ 705(20)(B), and California Government Code § 12926.

9        15.    Hereafter, references to Plaintiffs shall be deemed to include the named Plaintiffs

10   and each member of the class proposed below, unless otherwise indicated.

11       16.    Presently, and at all times relevant to this Complaint, Defendant City of Oakland is

12   and has been a public entity within the meaning of Title II of the ADA and has received federal

13   financial assistance sufficient to invoke the coverage of Section 504.  At all times relevant to this

14   Complaint, Defendant has received state financial assistance sufficient to invoke the coverage of

15   Cal. Govt. Code § 11135.

16       17.    Defendant is a local government entity with the responsibility of providing

17   Plaintiffs with full and equal access to its public facilities.  Defendant is responsible for

18   constructing, altering, maintaining, repairing, and regulating the pedestrian rights of way within

19   the City of Oakland.

20                **FACTUAL ALEGATIONS APPLICABLE TO ALL CLAIMS**

21       18.    Defendant has systematically failed, and is failing, to construct and maintain

22   accessible pedestrian rights of away in violation of federal and state law.  As a result of

23   Defendant's policies and practices, the City's pedestrian rights of way are characterized by

24   pervasive disability access barriers, which include but are not limited to the following:

25           a.  Missing curb ramps or curb ramps that do not comply with applicable federal

26               and state access standards on sidewalks adjacent to streets that have been

27               repaved or otherwise altered since June 3, 1977.

28

        b.   Unsafe, noncomplying curb ramps that have steep running slopes, excessive cross-slopes, lips or abrupt changes in elevation at the base of the ramp, excessive counter slopes or other conditions that fail to comply with applicable federal or state access standards in effect at the time they were constructed or altered.

        c.   Sidewalks that were built with widths or slopes that fail to comply with applicable federal or state access standards when they were constructed or altered.

        d.   Broken sidewalks or other walkways that are cracked, crumbled, steep, sunken, uplifted, or uneven.

        e.   Physical obstacles on the sidewalk between or at intersections, such as improperly placed signs or bus stop benches, lampposts, utility boxes, trash receptacles, and traffic signals.

        f.   Deteriorated, damaged or improperly repaired crosswalks that have excessive slopes, gaps in the surface and abrupt changes in level.

19. Defendant has known for decades of the inaccessibility of its pedestrian rights of way and of its obligation under federal and state law to provide accessible curb ramps and bring its sidewalks and crosswalks into compliance with applicable disability access laws and standards.

20. Under Section 504 and its implementing regulations, which went into effect on June 3, 1977, recipients of federal financial assistance such as the City are required to construct, alter and maintain their facilities, including those facilities comprising the pedestrian right of way, in a manner that complies with applicable design standards governing disability access.

21. Under Title II of the ADA, which became effective on January 26, 1992, public entities are required to construct, alter and maintain their facilities, including those facilities comprising the pedestrian right of way, in a manner that complies with applicable regulations and design standards governing disability access, including the 2010 ADAS or ADAAG, or UFAS depending on the date of construction or alteration.  28 C.F.R. § 35.151(c).

22.     Under California Government Code Section 11135, enacted in 1977, programs and activities that receive any financial assistance from the State of California must meet the protections and prohibitions contained in Title II of the ADA except to the extent that state law provides stronger protections and prohibitions.

23.     In July 2007, Defendant issued a "City Sidewalk Condition and ADA Survey, Final Report" ("Sidewalk Survey") based on a survey conducted by a third party under contract with the City.

24.     The Sidewalk Survey covered 1,126 miles of sidewalk and concluded that there were approximately 110,715 locations of damaged sidewalk covering approximately 7,248 square feet.  Such damage included faulting, cracks, uplifts and depressions that constitute barriers to persons with mobility disabilities.

25.     In addition to sidewalk damage, the Sidewalk Survey project surveyed the pedestrian rights of way for other "ADA barriers" resulting from factors other than sidewalk damage and tree barriers.  It found that there were another 53,999 such barriers, including "Cross Slope Hazard" locations, "Obstruction" locations, and "Travel Direction Slope" hazards.

26.     Despite these findings described in the Sidewalk Survey, Defendant has failed to remediate the sidewalk damage and barriers identified in the Survey and make its pedestrian rights of way accessible to persons with mobility disabilities.

27.     In conjunction with the Sidewalk Survey, Defendant engaged Policy Innovation Works to prepare a comprehensive draft "ADA Sidewalk Transition Plan 2007."  According to the Sidewalk Survey, statistical findings related to all ADA-related issues would be presented and analyzed further in this Sidewalk Transition Plan, a required component of the City's overall ADA Transition Plan.  Plaintiffs are informed and believe, and on that basis allege, that the 2007 Sidewalk Transition Plan has never been finalized or adopted by the City, and that the City has never adopted or implemented any comprehensive plan to remediate the sidewalk damage and other access barriers in the pedestrian rights of way that were identified in the Sidewalk Survey Report.

28.      Moreover, since the 2007 Sidewalk Survey, Defendant has disclaimed any responsibility for sidewalk barrier removal or repairs other than for sidewalk damage caused by "official" City-owned street trees.  Relying on state and local laws unrelated to disability access, and ignoring its obligations under the ADA, Section 504 and Cal. Govt. Code § 11135, Defendant asserts that "property owners are responsible for repairing damaged sidewalks adjacent to their property per state and local laws."  Defendant states this position prominently on various City web sites, including https://www.oaklandca.gov/resources/sidewalk-faq. and https://cao-94612.s3.amazonaws.com/documents/Sidewalk_RepairInfo_FAQ_final.pdf, without any mention of the ADA, Section 504, Cal. Govt. Code § 11135 or Defendant's own obligation to provide and maintain accessible sidewalks under federal and state law.

29.      The City of Oakland's funding for Sidewalk Repair was increased to one million dollars beginning with FY 2017-19 and FY 2018-19, and then further increased the following fiscal year.  But that amount is only available to "help ensure that the City takes care of its sidewalks – at parks, libraries and other City facilities, and those sidewalks damaged by official City trees." *Id.*  And the amount allocated is insufficient even for that limited purpose. As of September 2015, the City estimated that the cost of performing necessary repairs to its sidewalks was $28 million for damage caused by City-owned trees and $60 million for all other damage. And this estimate does not take into account the impact of inflation or the further deterioration and damage to the pedestrian rights of way that has occurred since the 2007 Survey.

30.      In its report to the City Council on the City's Annual Sidewalk Program covering the period of July 2020 through June 2021, the Director of the City's Department of Transportation reported that it was still in the process of completing its first comprehensive sidewalk damage inventory since 2007, and that it was working on a backlog of 1,400 reported locations citywide where an official tree had caused sidewalk damage, *i.e.* those locations for which the City accepts responsibility.  Of these locations, 709 were identified as sidewalk uplifts caused by trees that could not be remediated by a technique known as "horizontal shaving,'" meaning that they require concrete removal and replacement.

31.     As to those locations that the City characterizes as "private sidewalk damage," for which it claims no responsibility other than to give the property owner a "Notice to Repair," the City identified 1,200 locations for which a service request had been received but no Notice to Repair had been issued.  On information and belief, those locations (the ones for which service requests have been received) represent a fraction of the damaged sidewalk locations in the City for which the City disclaims responsibility.  The City itself has estimated that only 15% of the damaged sidewalks in Oakland are the responsibility of the City and that remediation of the remaining 85% must be paid for and undertaken by the property owner.

32.     Defendant's policies and practices with respect to curb ramps are equally deficient.  On May 5, 2009, the City adopted an ADA Curb Ramp Transition Plan dated April, 2009.  The transition plan was based on a citywide inventory of over 17,500 possible curb ramp locations that was allegedly conducted in 2002 and updated in 2008.  The 2009 Curb Ramp Transition Plan concluded that 18,687 curb ramps were required, including 12,803 at locations where no curb ramp existed, and 5,884 ramps at locations where a curb ramp existed but it did not comply with applicable access standards and required reconstruction.

33.     Defendant has failed to comply with its obligation under the ADA to provide compliant curb ramps on streets that have been altered since January 26, 1992, and to ensure that all new construction and alterations in the pedestrian rights of way comply with applicable disability access standards.  Defendant has also failed to comply with its obligation under Section 504 and its implementing regulations to ensure that new construction and alterations in the pedestrian right of way performed after June 3, 1977 complies with applicable federal access standards.  For example, when City streets, roads or highways are resurfaced, it triggers an obligation under 28 C.F.R. § 35.151 to provide curb ramps that comply with applicable federal and state access standards.  Defendant did not formally adopt a policy implementing this requirement until 2014.  Since 2014, Defendant has not consistently implemented this policy, allowing non-compliant curb ramps to remain in place on streets that have been resurfaced or otherwise altered and failing to install curb ramps on those streets where none existed.

34.     Defendant's failure to comply with its obligation to provide compliant curb ramps on resurfaced, altered or newly constructed streets is exemplified by sections of two streets on which Plaintiffs themselves have frequently traveled, Alcatraz Avenue and College Avenue. Based on city records, both of these streets have been resurfaced since January 26, 1992. Nonetheless, many of the curb ramps along these streets do not comply with federal or state access standards and deny full and equal access to Plaintiffs and other members of the proposed class.  The City's failure to provide compliant curb ramps on these altered streets is typical of the City's pedestrian rights of way.

35.     Defendant has failed to adopt or require the use of design standards for curb ramps, sidewalks and other elements of the pedestrian right of way that comply with the ADA and Section 504 and their applicable regulations and design standards, including the 2010 ADAS, ADAAG, or UFAS, and has also failed to require compliance with the applicable iteration of Title 24 of the CBC.

36.     With respect to its crosswalks, Defendant has taken no significant measures to ensure that they are readily accessible to and usable by persons with mobility disabilities.  The condition of the crosswalks has received no attention in the City's various surveys, transition plans and reports on the pedestrian right of way.  Crosswalks are not even mentioned in the City's 2019 policy preview of its next paving plan.  Defendant's paving policies and practices are marked by neglect and a failure to allocate funds necessary for street resurfacing, causing the roadway throughout the City, including those portions of the roadway that pass through intersections and crosswalks, to fall into a severe state of disrepair.  As a result, the City's crosswalks, most of which are comprised of asphalt, are marked by cracked, eroded and uneven surfaces, deep potholes, patching that results in changes in elevation, gaps around manhole covers and steep slopes and lips at the base of curb ramps serving the crosswalks, all of which constitute access barriers for Plaintiffs and putative class members.

37.     Defendant has failed to adopt and implement procedures to ensure that new construction and alterations in its pedestrian rights of way comply with applicable federal and state access standards even when the designs and plans provided to contractors or City

employees are consistent with those standards.  Defendant has also failed to adopt and implement policies and procedures that ensure that there are accessible alternative routes while new construction or alterations are being performed in the pedestrian rights of way.

38.     As a result of the above-described policies, procedures and practices, the City's pedestrian rights are way are characterized by pervasive access barriers to persons with mobility disabilities.  Many sidewalks have buckled due to tree roots uplifting the surface, resulting in abrupt changes in level.  Others have obstacles such as light poles, newspaper stands, utility boxes, signal poles, and bus benches narrowing the path of travel.  Many pedestrian rights of way are overdue for maintenance, with broken, cracked, crumbled, sunken, and/or caved concrete.

39.     The City has also failed, and is failing, to construct and maintain curb ramps in violation of federal and state law.  For example, thousands of intersections in the City have no curb ramps or an inadequate number of curb ramps even though at the time of construction or alteration, state or federal and state law required that curb ramps that comply with applicable federal and state disability access standards be provided.  Even among the intersections that do have curb ramps, many of them have curb ramps that  have lips where the sidewalk meets the street that are too steep, have excessive counter slopes at the base of the ramp, are too narrow, have excessive running or cross-slopes, or are otherwise noncompliant with applicable federal and state disability access standards.  Many other curb ramps are not maintained; they are broken, cracked, crumbled, sunken, and/or caved.

40.     As a result of Defendant's policies and practices with regard to the City's pedestrian walkways and disability access, large segments of the City's pedestrian rights of way do not comply with access requirements for new construction or alterations.  For example, the City has failed and continues to fail to install compliant curb ramps when it resurfaces City streets, roads and highways.  As a result, persons with mobility disabilities have been denied full and equal access to the City's pedestrian rights of way and to public buildings, parks, transportation, and/or places of public accommodation.

41.     The foregoing types of access barriers are present throughout the City's pedestrian rights of way, thus denying access to persons with mobility disabilities City-wide.  As a result of

these barriers, persons with disabilities have been denied access to public facilities and public accommodations.  Furthermore, these barriers discourage persons with mobility disabilities from travelling to or visiting areas of the City.  These barriers have also delayed travel and caused persons with mobility disabilities to fear for their safety, as these conditions often create situations that are dangerous for them, including but not limited to being forced to travel in the street with cars and busses as a result of missing or non-compliant curb ramps or inaccessible sidewalks.  This discrimination and systemic inaccessibility have a severe negative impact on persons with mobility disabilities within the City.

**Plaintiff Michael Curran**

42.    As the result of a spinal cord injury suffered approximately eleven years ago, Plaintiff Michael Curran has paraplegia at the T7 level.  He is unable to use his legs to walk and uses a manual wheelchair for mobility.

43.    Plaintiff Curran lives on 55th Street in Oakland near the border of Emeryville.  He routinely encounters numerous obstacles on the sidewalks and the other parts of the pedestrian right of way in his neighborhood and in traveling from his residence to other nearby areas that he goes to in order to shop, dine and run errands, and to engage in everyday life.  Plaintiff Curran routinely encounters barriers in the pedestrian rights of way that deny him full and equal access to the City's sidewalks, curb ramps and crossings, cause him pain, difficulty and discomfort, and deter him from using portions of the sidewalk or traveling to certain locations.

44.    Examples of specific instances and locations at which Mr. Curran has encountered barriers, and continues to encounter barriers, which deny him full and equal access and cause him pain, difficulty and discomfort in the City's pedestrian rights of way, include but are not limited to the following:

   a.  Mr. Curran regularly encounters a portion of the sidewalk on Marshall Street between 59th and Stanford Street on the east side of the street that is inaccessible and that causes him difficulty and discomfort because a section of the concrete sidewalk in the path of travel at that location is uplifted, causing an abrupt change in level.  When Mr. Curran encounters sections of sidewalk

that are cracked and uneven, he must approach them slowly and deliberately because traveling over cracked and uneven sidewalk causes his wheelchair to be off balance which greatly increases the chance that he will tip over and fall out of his wheelchair.

b.  Mr. Curran encounters a portion of the sidewalk on the east side of Marshall Street between 55th and Stanford Street where a section of the concrete sidewalk in the path of travel is uplifted, causing an abrupt change in level. Mr. Curran has fallen out of his wheelchair at this location and is extremely cautious, going slowly when travelling on this stretch of sidewalk.

c.  A section of the sidewalk on 64th street between San Pablo Avenue and Marshall Street on the south side of the street is broken, uneven, cracked and in disrepair.  This section of sidewalk prevents him from using that route without difficulty and discomfort.

d.  The concrete sidewalk on the east side of Marshall Street between 64th Street and 63rd Street is also damaged, with cracked, crumbled and uneven surfaces along the path of travel that Plaintiff Curran regularly uses.

e.  Mr. Curran regularly encounters a portion of the sidewalk on Marshall Street between Stanford Street and 55th Street on the east side of the street that is inaccessible due to cracked, crumbled, and uneven concrete.

f.  Mr. Curran is required to use an area of the sidewalk on Marshall Street between 61st Street and 59th Street on the east side of the street that is narrower than the required four feet in width.

g.  Similarly, the width of portions of the sidewalk on Marshall Street between Stanford Street and 59th Street on the south side of the street that Mr. Curran uses on a regular basis is narrower than four feet.  When encountering sidewalks that are less than the required four feet in width, Mr. Curran has had to use private driveways to enter the street and roll in the street until he can re-enter the sidewalk at another driveway or curb ramp.

h. Mr. Curran also frequently uses a section of the sidewalk on east  side of Marshall Street between Stanford Street and 55th Street that is inaccessible due to its uneven surface and cracks

i. The curb ramp on the northeast corner of Marshall Street and Stanford Street is inaccessible because it has a steep slope and does not comply with federal or state access standards.  This curb ramp causes Mr. Curran difficulty and discomfort, and exposing him to the risk of tipping and falling out of his wheelchair.

j. Mr. Curran has been prevented from using the pedestrian right of way at the southeast corner of 64th Street and Marshall Street because the corner has no curb ramp, thus denying him the ability to enter the crosswalk from the sidewalk or, when traveling in the other direction, access the sidewalk from the crosswalk.  When there is no curb ramp, Plaintiff Curran is forced to travel in the street with vehicular traffic and risk his safety and life.

k. The absence of a curb ramp has also prevented Mr. Curran from using the pedestrian right of way at the southwest corner of 64th Street and Marshall Street, denying him the ability to enter the crosswalk at that location from the sidewalk or, when traveling in the other direction, access the sidewalk from the crosswalk.  According to records made available online by the City of Oakland, this section of Marshall Street was included in a street resurfacing project that occurred within the past ten (10) years.  Under federal and California law, the City was required to remediate the curb ramps at that time and bring them into compliance with the 2010 ADAS and the CBC.  Based on the appearance of the curb ramps, including their design and the fact that they lack truncated dome detectible warnings associated with newer curb ramps, Plaintiffs believe and thereupon allege that the City has failed to fulfill its obligation in that regard.

l.   Mr. Curran regularly encounters a portion of the crosswalk between the northeast and northwest corners of Marshall Street and 64th Street that is inaccessible due to the fact that the surface is uneven, cracked and eroded.

m.   The crosswalk that connects the northeast and southwest corners of Marshall Street and 62nd Street are also inaccessible to Mr. Curran because of its uneven, cracked and deteriorated surface.

n.   At the 'T' intersection on Marshall and 55th Street, there is no curb ramp at all on the northwest corner.  A person with a mobility disability, such as Mr. Curran, would either need to travel in the street and traverse a steep driveway or travel the full length of the east side of the block, encountering the aforementioned sidewalk barriers, to the intersection of Marshall Street and Stanford Avenue, cross the street, and the travel the full length of the west side of the block, encountering additional sidewalk barriers, back to the corner of Marshall Street and 55th Street in order to get from the northeast corner to the northwest corner of Marshall Street.

45.     Because of the City's broken, uplifted, narrow and obstructed sidewalks, when traveling along the pedestrian right of way, Mr. Curran is often required to exit the sidewalk to avoid barriers, go onto the street and travel in the roadway with cars and busses for the distance of approximately one block (resulting in serious safety risks), and then come back onto the sidewalk at a different location.

46.     The access barriers that Plaintiff Curran experiences are not limited to his neighborhood.  Mr. Curran often runs errands and/or shops in other parts of the City, and when he does so he encounters the same types of access barriers described herein.

47.     As a result of the foregoing, Plaintiff Curran has been and continues to be denied full and equal access to the City's pedestrian rights of way.  Moreover, he is often unable to visit public facilities, places of public accommodations or friends in order to remain safe from the serious risks associated with traveling on the inaccessible pedestrian rights of way in the City.

1    He is also often forced to risk his safety and life by traveling in the street in order to avoid these

2    access barriers.

3    **Plaintiff Nicole Brown-Booker**

4        48.    Plaintiff Nicole Brown-Booker was diagnosed with Rheumatoid Arthritis at the

5    age of two.  As a result of this condition, she has been subject to loss of cartilage, reduced bone

6    growth, extreme inflammation and joint damage and is non ambulatory.  She uses a power

7    wheelchair on a daily basis for mobility.

8        49.    Plaintiff Brown-Booker currently resides in Oakland on 60th Street near Dover

9    Street.  Ms. Brown-Booker has both a desire and need to travel along the pedestrian rights of way

10   throughout the City of Oakland for professional and personal reasons.  She frequently attends

11   meetings, shops, dines and runs errands in Oakland and uses the pedestrian rights of way to do

12   so.  In the course of these activities, Ms. Brown-Booker routinely encounters barriers in the

13   pedestrian right of way that deny her full and equal access to the City's sidewalks, cause her

14   pain, difficulty and discomfort, and deter her from using portions of the sidewalk or traveling to

15   certain locations.

16       50.    Examples of specific instances and locations at which Ms. Brown-Booker has

17   encountered and continues to encounter barriers in the City's pedestrian rights of way, which

18   deny her full and equal access and cause her pain, difficulty and discomfort, include but are not

19   limited to the following:

20       a.    On a weekly basis, in traveling to appointments and social activities from her

21         home, Ms. Brown-Booker has encountered and continues to encounter narrow

22         sidewalks with excessive cross-slopes along Dover Street from 60th Street to

23         Alcatraz Avenue and along Alcatraz Avenue from Dover Street to Adeline

24         Street.  These cross-slopes are particularly steep where driveway aprons cross

25         the sidewalk for long stretches to provide vehicular access to the garages for

26         multi-unit apartment buildings.

27       b.    On a weekly basis, Ms. Brown-Booker shops at the Trader Joe's Market

28         located at College Avenue and Oak Grove Avenue in Oakland.  Each time she

1    does so, she encounters and is required to traverse curb ramps on both the

2    northwest and southwest sides of the intersection that are narrow and steep and

3    fail in other respects to comply with applicable federal and state disability

4    access standards.  In addition, both of these ramps are broken or damaged at

5    the base of the ramp or fail to have a smooth transition from the ramp to the

6    street crossing.  The ramp on the northwest corner has a brick gutter that is

7    partially covered by deteriorated asphalt, making an uneven surface.  It is also

8    a diagonal ramp purporting to serve two crosswalks but is not encompassed by

9    crosswalk markings or is not aligned with the crosswalk, so that Ms. Brown-

10    Booker and other wheelchair users are forced to travel outside of the crosswalk

11    and in the roadway when using the ramp to leave the sidewalk and cross the

12    street.  According to records made available online by the City of Oakland, this

13    section of College Avenue was included in a street resurfacing project that

14    occurred within the past ten (10) years.  Under federal and California law, the

15    City was required to remediate the curb ramps at that time and bring them into

16    compliance with the 2010 ADAS and the CBC.  Based on the appearance of

17    the curb ramps, including their design and the fact that they lack truncated

18    dome detectible warnings associated with newer curb ramps, Plaintiffs believe

19    and thereon allege that the City has failed to fulfill its obligation in that regard.

20    c.   When traveling along College Avenue on the west side of the street, Ms.

21    Brown-Booker has encountered numerous other barriers, including two

22    portions of the sidewalk near the corner of College Avenue and Claremont

23    Avenue adjacent to an empty lot.  These sections of the sidewalk are at

24    driveways that are no longer in use, and have severe cross slopes and, at one of

25    the driveways, broken, crumbled concrete in the path of travel.  Ms. Brown-

26    Booker has been deterred from using this portion of the sidewalk because of a

27    past experience where she almost tipped her wheelchair because of such

28    barriers.

d.  Ms. Brown-Booker has experienced difficulty attempting to use the crosswalk signal button at the northernmost curb ramp at the intersection of College Avenue and Claremont Avenue because of an inaccessible landing at this location to allow her to safely reach and push the crosswalk button.

e.  Along College Avenue is a curb ramp in front of the College Avenue United Presbyterian Church, serving the "T" Intersection of College Avenue and Harwood Avenue.  This curb ramp is steep and does not comply with federal or state access standards.  Further, there is no curb ramp on the other side of the street serving the crosswalk from this curb ramp.  The curb ramp on the southeast corner of College Avenue and Harwood faces the other side of Harwood and cannot be accessed from College Avenue without traveling outside of the crosswalk and into the street.  In addition, both curb ramps on Harwood at College Avenue have steep running slopes and side flares, lips and uneven surfaces at the base of the ramps and are otherwise non-compliant with applicable disability access standards.  While Ms. Brown-Booker travels on these curb ramps, she does so with fear and anxiety because the condition of the ramps puts her at risk of falling out of her wheelchair or becoming stuck in traffic.  These are conditions that Ms. Brown-Booker confronts every time she travels along College Avenue between the City's northern boundary and the Rockridge BART station.

f.  Ms. Brown-Booker has experienced difficulty traversing the sidewalks of College Avenue immediately north of the intersection of College Avenue and Harwood (particularly on the west side College), which are broken, uneven, cracked and in disrepair.

g.  Ms. Brown-Booker has also traveled along College Avenue on the south side of the BART station to visit the shops, restaurants and bookstores in that area.  In doing so, she must utilize the intersection of College Avenue and Keith Avenue near the main entrance of the Rockridge BART station.  During the

past three years, all four of these curb ramps had excessive running slopes, steep flares and broken, and uneven pavement where the road meets the concrete gutter.  All of these ramps should have been replaced and made compliant with federal and state access standards in connection with prior resurfacing projects on this part of College Avenue.

h.  When traveling along Alcatraz Avenue to and from her home, Ms. Brown-Booker regularly encounters a curb ramp at the southeast corner of Alcatraz Avenue and Telegraph Avenue that is obstructed by a turn signal pole and other structures, which obstructs the path of travel from the ramp to the sidewalk.  The curb ramp is also non-compliant with federal and state access standards in other respects, notwithstanding the fact that the City was required to replace or repair this ramp to bring it into compliance with the 2010 ADAS and the CBC as part of a street resurfacing project that covered the entire stretch of Alcatraz Avenue from Dover Street to just below Adeline Street within the past ten (10) years.

i.  Just beyond the curb ramp at the southeast corner of Alcatraz Avenue and Telegraph Avenue, at the location of a driveway entrance off of Alcatraz Avenue into the Pet Food Express Parking Lot, the sidewalk is cracked, crumbled and elevated, causing an uneven and unstable surface for persons with mobility disabilities.  Ms. Brown-Booker encounters this barrier every day on her way to her office from home, causing her difficulty and discomfort.

j.   Ms. Brown-Booker has used other routes to travel from home to work and back and has consistently encountered barriers on such routes.  For example, traveling north on the east side of Racine Street toward Alcatraz Avenue she encounters an intersection at Racine Street and North Street where, on both sides of the street, a ditch separates the sidewalk from the street.  Wood planks have been placed over the ditch to join the sidewalk with the street, but they have a narrow combined width, rough surfaces, gaps between the planks and

gaps and lips where the boards meet the road.  These factors make this crossing extremely treacherous for a wheelchair user like Ms. Brown Booker because a slight miscalculation to one side or the other while crossing the boards would cause one of the wheels to drop into the ditch, toppling her and her chair into the ditch.  Since this is at a "T" intersection there is no other ramp that allows her to cross the street and avoid these wooden ramps.  And if she backtracks to the last intersection to cross the street there, the curb ramps on the other side of the street are too steep and do not comply with federal and state access standards.  In order to avoid these barriers, Ms. Brown-Booker has had to use private driveways to enter the street and roll in the street for some distance until she can re-enter the sidewalk at another driveway or curb ramp.

k.  At the intersections of Racine Street and 63rd Street and Racine and 62nd Street there are no curb ramps at all.  As a result, Mr. Brown-Booker has been prevented from using these portions of the pedestrian right of way entirely.

l.  Ms. Brown-Booker regularly visits downtown Oakland to go to her hair salon and other shops, dine in downtown restaurants and meet friends.  Ms. Brown-Booker has encountered and continues to encounter numerous barriers in the pedestrian right of way in the downtown area.  These include, for example, multiple locations along Broadway and Jefferson Street, in the area of 10th through 14th Streets, where construction has interfered with access to the sidewalks for persons with mobility disabilities and the City has failed to provide alternative means of access during construction.  At the intersection of Jefferson Street and 10th Street, there is no curb ramp at all on the northeast corner where until recently a Subway sandwich shop was located, and access to the northeast corner has been blocked by construction.

m.  Construction has also interfered with Ms. Brown-Booker's access to the sidewalks at the intersection of Franklin Street and 13th Street, where the Tribune Tower is located.  All of the curb ramps at this intersection, like many

others throughout the City, are non-compliant with federal and state disability access standards including ADAAG, 2010 ADAS, and the CBC and have excessive slopes, lips where the ramps meet the pavement at the street crossing, and insufficient landing space at the bottom of the ramps to allow users to safely enter the crosswalk.  The ramp on one corner of this intersection consists of nothing more than a patch of concrete or asphalt laid up against the curb on the corner without regard to disability access standards.

n.   Ms. Brown-Booker also regularly encounters access barriers in the many crosswalks she uses throughout the City.  These include areas in the path of travel consisting of damaged, uneven, cracked and deteriorated asphalt that interferes with the safe, stable and smooth passage of her wheelchair.  At the intersection of College Avenue and Keith Street, for example, the asphalt in the path of travel is deteriorated around a sewer cover in the crosswalk, with deep fissures and gaps that can catch the wheels of her chair and mis-direct her into traffic.  Most of the other crosswalks Ms. Brown-Booker has used within the past three years in the City have presented her with similar barriers.

o.   Ms. Brown-Booker frequents many of the shops on College Avenue between Broadway and Alcatraz, including A Cote and Lavender Nail Salon, 2-4 times a week, but has difficulty because the sidewalks are broken, uneven and in disrepair.  Most of these sidewalk problems on College Avenue are north of the Rockridge BART station, but also south of Rockridge BART.  For years, she was forced to navigate a very steep curb ramp by Pegasus Books on Ocean View Drive and College Avenue – a sewer drain opening close to the curb ramp itself made this curb ramp particularly dangerous her.  On information and belief, this location was only fixed within the last year.

p.   Ms. Brown-Booker visits her dry cleaner, SheWat Restaurant, and other businesses on Shattuck Avenue between Alcatraz Avenue and 51st Street 3-4 times a week.  However, panels of sidewalks in this area are raised and

1      displaced and are uneven and broken.

2   q.  On a daily basis, Ms. Brown-Booker visits businesses on Martin Luther King

3       Jr. Way between Alcatraz Avenue and Children's Hospital, including several

4       bakeries, her local hardware store, and a favorite coffee shop.  The sidewalks

5       in this area are extremely dangerous and in some areas unnavigable, and

6       include a very large vertical change in elevation between sidewalk panels.

7   r.  Ms. Brown Booker frequents restaurants on Telegraph between Alcatraz

8       Avenue and 40th Street (MacArthur BART), including Cholita Linda, 3-4

9       times a month to meet for lunch and dinner with friends and work colleagues.

10      Sidewalks in this area are broken, uneven and in disrepair and have multiple

11      dangerous changes in elevation.

12  s.  Ms. Brown-Booker patronizes Oaktown Spice and Coach Sushi and enjoys

13      time by Lake Merritt approximately once every 2-3 months.  She encounters

14      sidewalks in this area that are broken, uneven and in disrepair, and have

15      multiple dangerous cracks from 19th Street BART station along Grand

16      Avenue.

17  t.  In Downtown/Uptown Oakland, Ms. Brown-Booker enjoys patronizing

18      restaurants and a bakery in this area.  However, the sidewalks in this area along

19      Broadway between 12th Street BART station and 23rd Street are broken,

20      uneven, cracked and in disrepair.

21  u.  Approximately once a month, Ms. Brown-Booker sometimes travels along

22      Telegraph instead of Broadway to access businesses on Broadway and 23rd St.

23      The sidewalks near the Fox Theater where Telegraph meets Broadway are

24      broken, uneven, cracked and in disrepair.

25  v.  The northwest curb ramp at the intersection of 17th Street and Broadway, near

26      the elevator from 19th Street BART station is extremely steep and has a

27      drainage grate very close to where the crosswalk surface interfaces with the

28      curb ramp.  At times of heavy rain, this area also overflowed with drainage

water, making it very difficult to use this curb ramp.  Ms. Brown-Booker is forced to travel an extra street to avoid this curb ramp.

w.  Ms. Brown-Booker also has had difficulty traversing a steep curb ramp by Itani Ramen on Telegraph & 18th Street.

x.  Ms. Brown-Booker travels to Jack London Square from 12th Street BART approximately every 6 weeks to go to the movies, have lunch and dinner with work colleagues and friends.  The sidewalks in this area have uneven surfaces and large cracks that are difficult to navigate.  She also travels from 12st Street BART to Nido's Backyard for lunch meetings, going down Broadway to 3rd St. or 4th St. and then left to Nido's.  She encounters sidewalks that are broken, uneven and in disrepair in this area every time she goes to Nido's.

y.  On Telegraph between 51st and 55th on the side of the street where Mariposa Bakery is, the sidewalks are broken, cracked and in disrepair.  Ms. Brown-Booker goes to this area 3-4 times a week to access the Whole Foods, the farmer's market at the Department of Motor Vehicles parking lot, and out to dinner to restaurants in this area.

51.  As a result of the foregoing, Plaintiff Brown-Booker has been and continues to be denied full and equal access to the City's pedestrian rights of way.  Moreover, she is often unable to visit public facilities, places of public accommodations or friends in order to remain safe from the serious risks associated with traveling on the City's inaccessible pedestrian rights of way. She is also often forced to risk her safety and life by traveling in the street with cars and busses in order to avoid these access barriers.

52.  The above-described examples of Plaintiffs' encounters with barriers in the City's pedestrian rights of way are typical of their experiences and the experiences of other persons with mobility disabilities in Oakland and illustrate the inaccessibility, fear, humiliation, and isolation that people with mobility disabilities experience while trying to navigate the City's pedestrian rights of way.  Throughout the City, the sidewalks are replete with broken, cracked, uplifted, and narrow sections of sidewalk, including severe uplifting caused by tree roots, makeshift asphalt

patches, severe cross-slopes, and narrow paths of travel resulting from improper design, obstructions such as signposts, tree wells, signal poles, utility boxes, trash receptacles, and other objects, and failure to maintain sidewalks in accessible and usable condition.  Similarly, the crosswalks encountered by Mr. Curran, Ms. Brown-Booker and other persons with mobility disabilities typically have potholes, gaps or other damage, uneven surfaces from multiple asphalt patches, and deteriorated surfaces in the path of travel.  Asphalt damage or sloping where crosswalks meet the base of curb ramps is commonplace and creates uneven transitions, lips and steep counter slopes that are travel hazards.  Thousands of corners are missing curb ramps, and thousands of other corners have curb ramps with steep running slopes, excessive cross slopes, damaged surfaces, or other characteristics that make them inaccessible to and unusable by people with mobility disabilities.

53.     Plaintiffs therefore seek injunctive and declaratory relief requiring Defendant to ensure compliance with Title II of the ADA, Section 504, California Government Code § 11135, *et seq.*, and their accompanying regulations.  The named Plaintiffs also seek compensatory damages for themselves on an individual basis pursuant to Title II of the ADA.

## CLASS ALLEGATIONS

54.     Plaintiffs bring this action individually and on behalf of all other persons similarly situated and seek class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief only.

55.     **Class Definition.**  Plaintiffs seek to represent the following class:  All persons with mobility disabilities who use wheelchairs, scooters, canes or other mobility aids and who use or desire to use pedestrian rights of way that are open to the public in the City of Oakland.

56.     **Class Period.**  The class period is defined as commencing three years prior to the filing of this action.

57.     Excluded from the above-referenced class is any judge assigned to hear this case (or any spouse or family member of any assigned judge), or any juror selected to hear this case.

58.     **Impracticability of Joinder (Numerosity of the Class).**  The members of the proposed class are so numerous that joinder of all such persons is impracticable and the

disposition of their claims in a class action is a benefit to the parties and to this Court.  On information and belief, the number of persons in this case exceeds 10,000 persons.

59.    **Questions of Fact and Law Common to the Class.**  All members of the class have been and continue to be denied their civil rights to full and equal access to the City's pedestrian rights of way.  The common questions of law and fact shared by the named Plaintiffs and all class members include:

a.    Whether Defendant is violating Title II of the ADA by failing to make its pedestrian rights of way readily accessible to and useable by persons with mobility disabilities, and otherwise discriminating against persons with mobility disabilities;

b.    Whether Defendant is violating Section 504 by failing to make its pedestrian rights of way readily accessible to and useable by persons with mobility disabilities, and otherwise discriminating against persons with mobility with disabilities;

c.    Whether Defendant is violating Cal. Govt. Code §§ 11135, *et seq.*, which requires that persons with mobility disabilities receive full and equal access to the benefits of a public entity's facilities, programs and services if the public entity receives any financial assistance from the State of California;

d.    Whether Defendant constructed or altered any parts of its pedestrian rights of way after June 3, 1977;

e.    Whether any parts of Defendant's pedestrian rights of way that were constructed or altered from June 3, 1977 through January 26, 1992 comply with applicable federal disability access standards, including *inter alia*, UFAS;

f.    Whether Defendant constructed or altered any part of its pedestrian rights of way after January 26, 1992;

g.    What any parts of Defendant's pedestrian rights of way that were constructed or altered between January 26, 1992 and March 15, 2012

1       comply with ADAAG or UFAS;

2       h.      Whether Defendant constructed or altered any part of its pedestrian rights

3               of way after March 15, 2012;

4       i.      Whether any parts of Defendant's pedestrian rights of way that were

5               constructed or altered after March 15, 2012 comply with the 2010 ADAS;

6       j.      Whether Defendant has remediated any parts of its pedestrian rights of way

7               that were constructed or altered after January 26, 1992 and which do not

8               comply with applicable federal or state disability access standards as

9               required by 28 C.F.R. § 35.151(c)(5);

10      k.      Whether Defendant has maintained its pedestrian rights of way so that they

11              are readily accessible to persons with mobility disabilities as required by

12              the ADA, Section 504 and Cal. Govt. Code §§ 11135, *et seq.*;

13      l.      Whether Defendant has made reasonable modifications in policies,

14              practices and/or procedures to ensure that persons with mobility disabilities

15              have full and equal access to its pedestrian rights of way;

16      m.      Whether Plaintiffs and the putative class members have been injured by

17              Defendant's acts and omissions; and,

18      n.      Whether Plaintiffs and the members of the putative class are entitled to

19              declaratory and injunctive relief, and the nature of such relief.

20      60.     **Typicality.**  The claims of the named Plaintiffs are typical of those of the proposed

21 class.  Plaintiffs' claims are typical of the claims of the proposed class in the following ways:

22 1) Plaintiffs are members of the proposed class; 2) Plaintiffs' claims arise from the same uniform

23 policies, procedures and practices and course of conduct on the part of the City of Oakland;

24 3) Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed

25 class and involve similar factual circumstances; 4) the injuries of the named Plaintiffs are similar

26 to the injuries suffered by the proposed class members; and 5) the injunctive and declaratory

27 relief sought herein will benefit the named Plaintiffs and all class members alike.

28

61.    **Adequacy.**  The named Plaintiffs will fairly and adequately represent the interests of the proposed class.  They have no interests adverse to the interests of other members of the class and have retained counsel who are competent and experienced in litigating complex class actions, including large-scale disability rights class action cases.

62.    **The Class Meets the Requirements of Federal Rule of Civil Procedure 23(b)(2).**  Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or declaratory relief with respect to the class as a whole.  Defendant has failed and refused to provide persons with mobility disabilities with full and equal access to the City's pedestrian rights of way.  Defendant has failed and refused to adopt, implement or enforce appropriate policies, procedures and/or practices that are necessary to ensure that persons with mobility disabilities are provided with full and equal access to its pedestrian rights of way.

## FIRST CLAIM

**Violations of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.***

63.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

64.    When it enacted the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including … the discriminatory effects of architectural … barriers."  42 U.S.C. § 12101(a)(5).

65.    Congress further found that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem."  42 U.S.C. § 12101(a) (2).

66.    In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities."  42 U.S.C. § 12101(b) (1)-(2).

67.     Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

68.     At all times relevant to this action, Defendant is a "public entity" within the meaning of Title II of the ADA.

69.     At all times relevant to this action, Plaintiffs are qualified individuals with disabilities within the meaning of Title II of the ADA and meet the essential eligibility requirements for the receipt of the services, programs, or activities of the City.  42 U.S.C. § 12131.

70.     Defendant's pedestrian rights of way and the construction, alteration, maintenance, and regulation thereof constitute a program, service, or activity within the meaning of Title II of the ADA.  *Cohen v. City of Culver City*, 754 F.3d 690, 695-96 (9th Cir. 2014).

71.     The elements of the City's pedestrian rights of way, including sidewalks, walkways, curb ramps and crosswalks, are facilities within the meaning of 28 C.F.R. § 35.104, which defines "Facility" broadly to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."

72.     The acts and omissions alleged herein constitute violations of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§12131, *et seq.*, and the regulations promulgated thereunder.  Defendant's discriminatory conduct alleged herein constitutes, *inter alia*: (a) failing and refusing to provide full, equal and safe access to the City's pedestrian rights of way; (b) performing new construction to the City's pedestrian rights of way after January 26, 1992 that does not comply with applicable federal access standards, including ADAAG, UFAS and/or the 2010 ADAS; (c) performing alterations to the City's pedestrian rights of way after January 26, 1992 that do not comply with applicable federal access standards, including ADAAG, UFAS and/or the 2010 ADAS; (d) failing to ensure that newly constructed or altered

streets, roads, highways have curb ramps at any intersection having curbs or other barriers to entry from a street level pedestrian walkway; (e) failing to ensure that newly constructed or altered street level pedestrian walkways contain curb ramps at intersections to streets, roads, or highways; (f) failing to ensure that third-party entities that performed new construction or alterations in the City's pedestrian rights of way after January 26, 1992 complied with federal access standards, including ADAAG, UFAS and/or the 2010 ADAS; (g) failing and refusing to remediate non-complying new construction and alterations as required by 28 C.F.R. § 35.151(c)(5); (h) failing to maintain in operable condition those features of facilities that Title II of the ADA requires to be readily accessible to and usable by persons with disabilities as required by 28 C.F.R. § 35.133; (i) failing and refusing to make reasonable modifications in policy and practice that are necessary to ensure that persons with mobility disabilities have full and equal access to Defendant's pedestrian rights of way; and (j) failing to take prompt and equitable steps to remedy the City's discriminatory conduct.  Defendant has violated Title II of the ADA and its implementing regulations in multiple respects, as further alleged below.

● **Failure to Comply with Applicable Disability Access Standards in New Construction or Alteration of Facilities in the Pedestrian Rights of Way**

73.     Since January 26, 1992, Defendant has constructed and altered portions of the pedestrian right of way, including sidewalks, curb ramps, crosswalks, and other walkways, in a manner that does not comply with federal access standards thus rendering such facilities inaccessible to persons with mobility disabilities.  Examples of such non-compliant construction and alterations include:

a.   The construction or alteration of sidewalks that are too narrow or that have a cross slope in excess of 2% or a running slope in excess of 5%.

b.   The construction or alteration of curb ramps that have a running slope that exceeds 8.33%, that lack a level landing of the required dimensions at the top or bottom of the ramp or that fail to provide a flush transition from the base of the curb ramp to the crosswalk.

c.  The construction or alteration of crosswalks and curb ramps that lack a level transition to the crosswalk or that have a counter slope in excess of the maximum permitted of 5%.

● **Failure to Construct Accessible Curb Ramps on Resurfaced or Altered Streets**

74.  The regulations implementing Title II of the ADA specifically provide that a public entity must install curb ramps that comply with ADAAG or UFAS at intersections whenever it constructs or alters sidewalks, streets, roads and/or highways during the period between January 26, 1992 and March 15, 2012.  After March 15, 2012, a public entity was required to install curb ramps that comply with the 2010 ADAS whenever it constructed or altered streets, sidewalks, roads and/or highways.  28 C.F.R. § 35.151(c), (i).

75.  Newly constructed or altered facilities that were constructed or altered before March 15, 2012, and that do not comply with the ADAAG or UFAS, must be made accessible in accordance with the 2010 ADAS.  28 C.F.R. § 35.151(c)(5).  A street resurfacing project by a public entity is an alteration within the meaning of the regulation.  *Kinney v. Yerusalim*, 9 F.3d 1067, 1073-74 (3rd Cir. 1993).

76.  Defendant has resurfaced or otherwise altered hundreds of City streets during the period from January 26, 1992 through the present.  The methods used for resurfacing these streets typically include methods that constitute an alteration of the roadway within the meaning of the ADA and its implementing regulations and trigger the obligation to provide curb ramps that comply with applicable federal access standards on sidewalks adjacent to the resurfaced streets.  The most common of these is the "mill and overlay" process, which involves milling the existing pavement and then applying a new asphalt overlay in the range of 2 to 6 inches, resulting in a "like new" street.  *See* https://www.oaklandca.gov/resources/pavement-treatments.

77.  Plaintiffs are informed and believe, and on that basis allege, that Defendant has failed to install curb ramps that comply with federal access standards or bring into compliance existing curb ramps at hundreds of locations adjacent to repaved or altered streets since January 26, 1992, in violation of the ADA and its implementing regulations.

● **Failure to Maintain and Repair Accessible Features of the Pedestrian Rights of Way**

78.     A public entity must maintain the accessible features of all facilities required to be accessible by the ADA such that they are readily accessible.  28 C.F.R. § 35.133.

79.     Defendant's sidewalks are among those facilities that the City must maintain in operable working condition.  *Cohen v. City of Culver City*, 754 F.3d 690, 699 (9th Cir. 2014). Likewise, because they constitute portions of roads and walks, the City's maintenance obligation under the ADA and its regulations extends to crosswalks, curb ramps and other walkways.  28 C.F.R. § 35.104; 28 C.F.R. § 35.133(a).

80.     Plaintiffs are informed and believe, and on that basis allege, that Defendant's sidewalks and other walkways comprising the pedestrian rights of way were free from certain defects at the time of their construction.  Specifically, the City's sidewalks were unbroken and free from damage or deterioration such as uplifted sections of sidewalk, cracks or other gaps in the surface, or abrupt changes in elevation that constitute barriers to persons with disabilities.

81.     Plaintiffs are further informed and believe, and on that basis allege, that at the time of their construction Defendant's crosswalks were free from damage or deterioration, including potholes and asphalt erosion or breaks in concrete that constitute access barriers to persons with mobility disabilities.

82.     Since the construction of Defendant's sidewalks, crosswalks, and curb ramps, and since January 26, 1992, Defendant has failed and refused to fulfill its obligation to maintain its once-accessible sidewalks, crosswalks and curb ramps in a condition such that they continue to be readily accessible to and usable by persons with mobility disabilities, as alleged herein.

83.     Defendant conducted a Citywide Sidewalk Condition and ADA Survey in 2006 and produced a Final Report of the results of the Survey in July 2007.  The Report concluded that within 1,126 miles of sidewalk surveyed, there were 110,715 locations where there was sidewalk damage.  Defendant defines sidewalk damage as including "any crack, depression, or vertical offset of more than ¼ inch."  According to the City, any such condition is "considered a defect, per Americans with Disabilities Act (ADA) guidelines."

84.     In a report dated September 21, 2015, the Right of Way Management Division of the Oakland Public Works Department reported that about 16% of the City's sidewalks required repairs, at an estimated cost of $88 million.

85.     Relying on Sections 5610, *et seq.* of the California Government Code, which purports to make it the responsibility of property owners to maintain and repair sidewalks adjacent to their properties in such condition so as to not endanger persons or property or interfere with the public convenience in the use of such sidewalks, Defendant has failed and refused to accept its own responsibility under the ADA for the maintenance of any sidewalks other than those adjacent to City properties or those damaged by "official" City trees or other City actions.  Defendant has codified this position in its own local municipal code.  Oakland Municipal Code § 12.22.020.

86.     Consistent with Defendant's position that the City has no responsibility for sidewalk maintenance adjacent to private property, Defendant operates an "ADA Sidewalk Repair Program" that purportedly expedites necessary sidewalk repairs requested by persons with disabilities, but expressly limits the program to sidewalks damaged by City street trees and excludes repairs that Defendant claims are the responsibility of private property owners.

87.     Defendant has also violated its obligations under the ADA with respect to its pedestrian rights of way by adopting what it refers to as a "Buy-Sell-Repair" Ordinance, OMC 12.04.030.  This ordinance, adopted in July 2019, attempts to transfer Defendant's ADA compliance duties to private property owners by requiring them to remediate sidewalks that do not comply with applicable disability access standards as a condition of selling their property or in connection with alterations or renovations to their property in excess of $100,000.  This program encourages the deferral of the remediation of sidewalk barriers until adjacent private properties are sold or undergo substantial construction.  In the meantime, the City takes no action itself to remediate these non-compliant sidewalks.

88.     As a means for addressing damaged, inaccessible sidewalks, Defendant's "Buy-Sell-Repair" Ordinance has been grossly inadequate as a result of the City's failure to enforce its provisions.  Of the 8,721 properties sold in Oakland in the combined fiscal years 2020 and 2021,

only 3,160, or 36%, were sold with final or provisional compliance certificates indicating that the adjacent sidewalks were in compliance with applicable federal access standards when sold or would be brought into compliance within 120 days thereafter. Of the 504 properties where renovations greater than $100,000 were completed, only 47 were issued a valid sidewalk certification as being compliant with applicable access standards. Defendant has not adopted any measure for enforcing the requirements of the Buy-Sell-Repair Ordinance and has limited its efforts to seeking compliance to the sending of courtesy notices.

89.     Defendant claims that it enforces the obligation of private property owners to repair damaged sidewalks by issuing Notices to Repair ("tickets") and requiring that the necessary repairs be performed within 30 days. Plaintiffs are informed and believe, and on that basis allege, that such repairs rarely happen, and that Defendant undertakes insufficient enforcement action to ensure that they do. Defendant only employs two full time inspectors who can devote any time to inspecting sidewalks, and yet there are 3,600 "open tickets" representing sidewalk damage that has been cited but not remediated. This represents a small fraction of the more than 110,000 instances of sidewalk damage identified in the 2007 survey, a number that has almost certainly increased significantly in the past fifteen years. Another 115 tickets are issued on average each year, and only 170 permits for sidewalk repair are issued per year. Thus, the access barriers arising from sidewalk damage, which represents only one category of barrier in the City's pedestrian rights of way, are being addressed by the City, if at all, at a very slow pace, thus denying full and equal to persons with mobility disabilities. Moreover, under one of Defendant's new policies, those barriers that the City contends are the responsibility of the property owner would be allowed to remain in place until ownership of the property is transferred. In many instances, Defendant's policy results in remediation being delayed by several years, if it happens at all.

90.     Even as to those sidewalks for which Defendant acknowledges responsibility, the City has failed to remove access barriers caused by broken or uplifted sidewalk segments or other damage or deterioration of the sidewalk. As of FY 2021, the City had identified 8,484 locations that it was only beginning to address under a new contract using horizontal concrete shaving.

1   The City also had a backlog of more than 1,500 reports of sidewalk damage related to recorded

2   official street trees.

3   91.     As a direct and proximate result of Defendant's violations of the ADA, as alleged

4   above, Plaintiffs have suffered injury, including *inter alia* denial of full and equal access to the

5   City's pedestrian rights of way, isolation, segregation, struggling to surmount access barriers,

6   fatigue, physical injuries, damage to wheelchairs and other mobility devices, and emotional

7   distress including humiliation, anxiety, indignity and embarrassment.

8   92.     Because Defendant's discriminatory conduct is ongoing, declaratory and injunctive

9   relief are appropriate remedies.  Plaintiffs have no adequate remedy at law.  Pursuant to 42

10  U.S.C. § 12133, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable

11  attorneys' fees, litigation expenses, and costs incurred in bringing this action.

12  93.     By its conduct as alleged herein, Defendant has acted with deliberate indifference

13  to the federally protected civil rights of the named Plaintiffs, and to the harms that have been and

14  continue to be caused to them by Defendant's unlawful conduct in failing to make its pedestrian

15  rights of way accessible as required by federal law.  Accordingly, the named Plaintiffs are

16  entitled to recover compensatory damages under Title II of the ADA.

17  **SECOND CLAIM**
**Violations of Section 504 of the Rehabilitation Act of 1973**

18  **29 U.S.C. §§ 794, *et seq.***

19  94.     Plaintiffs incorporate by reference each and every allegation contained in the

20  foregoing paragraphs.

21  95.     Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o

22  otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability,

23  be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

24  under any program or activity receiving federal financial assistance . . ." 29 U.S.C. § 794.

25  96.     Plaintiffs are otherwise qualified to participate in the services, programs, or

26  activities that are provided to individuals in the City.  29 U.S.C. § 794(b).

27  97.     Defendant and its departments or agencies having responsibility for the City's

28  pedestrian rights of way are direct recipients of federal financial assistance sufficient to invoke

the coverage of Section 504, and have received such federal financial assistance at all times relevant to the claims asserted in this Complaint.

98.    Defendant's pedestrian rights of way and the construction, alteration, maintenance, and regulation thereof constitute a program, service and/or activity within the meaning of Section 504 and its implementing regulations.

99.    The elements of Defendant's pedestrian rights of way, including sidewalks, curb ramps and crosswalks, are facilities within the meaning of 49 C.F.R. § 27.5, which defines "Facility" broadly to include "all or any portion of buildings, structures, vehicles, equipment, roads, walks, parking lots, or other real or personal property or interest in such property."

100.    The acts and omissions alleged herein constitute violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, *et seq.*, and the regulations promulgated thereunder.  Defendant's discriminatory conduct alleged herein constitutes, *inter alia*: (a) failing and refusing to provide full, equal and safe access to the City's pedestrian rights of way; (b) performing new construction to the City's pedestrian rights of way after June 3, 1977 that does not comply with applicable federal access standards, including but not limited to UFAS; (c) performing alterations to the City's pedestrian rights of way after June 3, 1977 that do not comply with applicable federal access standards, including but not limited to UFAS; (d) failing to ensure that newly constructed or altered streets, roads, highways have curb ramps at any intersection having curbs or other barriers to entry from a street level pedestrian walkway; (e) failing to ensure that newly constructed or altered street level pedestrian walkways contain curb ramps at intersections to streets, roads, or highways; (f) failing to ensure that third-party entities that performed new construction or alterations in the City's pedestrian rights of way after June 3, 1977 complied with federal access standards, including but not limited to UFAS; (g) failing and refusing to remediate new construction and alterations that do not comply with applicable federal access standards; (h) failing to maintain in operable condition those features of the City's pedestrian rights of way that are required to be readily accessible to and usable by persons with disabilities; (i) failing and refusing to make reasonable modifications in policy and practice that are necessary to ensure that persons with mobility disabilities have full and equal access to

1   Defendant's pedestrian rights of way; and (j) failing to take prompt and equitable steps to remedy

2   Defendant's discriminatory conduct.  The foregoing conduct has had, and continues to have, the

3   effect of excluding Plaintiffs from participation in, denying Plaintiffs the benefits of, and

4   subjecting Plaintiffs to discrimination in the benefits and services of the City's pedestrian rights

5   of way based solely by reason of their disabilities.

6   101.   As a direct and proximate result of Defendant's violations of Section 504, as

7   alleged above, Plaintiffs have suffered injury, including *inter alia* denial of full and equal access

8   to the City's pedestrian rights of way, isolation, segregation, struggling to surmount access

9   barriers, fatigue, physical injuries, damage to wheelchairs and other mobility devices, and

10   emotional distress including humiliation, anxiety, indignity and embarrassment.

11   102.   Because Defendant's discriminatory conduct is ongoing, declaratory and injunctive

12   relief are appropriate remedies.  Plaintiffs have no adequate remedy at law.  Pursuant to 42

13   U.S.C. § 794a(a) & (b), Plaintiffs are entitled to declaratory and injunctive relief as well as

14   reasonable attorneys' fees and costs incurred in bringing this action.

15   ### THIRD CLAIM
      **Violations of California Government Code §§ 11135, *et seq.***

16

17   103.   Plaintiffs incorporate by reference each and every allegation contained in the

18   foregoing paragraphs.

19   104.   Section 11135(a) of the California Government Code provides in pertinent part:

20   "No person in the State of California shall, on the basis of . . . disability, be unlawfully denied

21   full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any

22   program or activity that is … funded directly by the state, or receives any financial assistance

23   from the state."

24   105.   Pursuant to Section 11135(b) of the California Government Code, a violation of

25   the ADA constitutes a violation of Section 11135.

26   106.   Defendant's construction, alteration, maintenance, repair, oversight and regulation

27   of its pedestrian rights of way, including the sidewalks, curb, ramps, crosswalks, walkways and

28

all other elements or facilities comprising the pedestrian right of way are a program or activity within the meaning of Section 11150 of the California Code of Regulations.

107.    Defendant is a recipient of state financial assistance within the meaning of Section 11150 of the California Code of Regulations from the State of California sufficient to invoke the coverage of Government Code Sections 11135, *et seq.* Defendant, including its departments and agencies responsible for the City's pedestrian rights of way, was the recipient of such funding and financial assistance at all times relevant to the claims alleged in this Complaint.

108.    Defendant has violated and continues to violate Government Code § 11135 by engaging in the conduct alleged herein. Such conduct has denied, and continues to deny, Plaintiffs full and equal access to the benefits of the City's pedestrian rights of way based on their disabilities.

109.    Defendant has refused and failed to provide Plaintiffs with full and equal access to their facilities, programs, services and activities as required by California Government Code Sections 11135, *et seq.* through their policies, procedures and practices with regard to the City's pedestrian rights of way and disability access.

110.    As a direct and proximate result of Defendant's violations of Government Code §§ 11135, *et seq.*, as alleged above, Plaintiffs have suffered injury, including *inter alia* denial of full and equal access to the City's pedestrian rights of way, isolation, segregation, struggling to surmount access barriers, fatigue, physical injuries, damage to wheelchairs and other mobility devices, and emotional distress including humiliation, anxiety, indignity and embarrassment.

111.    Because Defendant's discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Plaintiffs have no adequate remedy at law. Pursuant to Government Code § 11139, Plaintiffs are entitled to equitable relief.

112.    Plaintiffs are also entitled to their reasonable attorneys' fees and costs incurred in bringing this action pursuant to Cal. Code of Civ. Proc. § 1021.5.

## ALLEGATIONS SUPPORTING DECLARATORY AND INJUNCTIVE RELIEF

113.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

114.    A present and actual controversy exists regarding the respective rights and obligations of Plaintiffs and Defendant.  Plaintiffs desire a judicial determination of their rights and Defendant's obligations in a declaration as to whether, and to what extent, Defendant's conduct violates applicable law.

115.    Such a declaration is necessary and appropriate at this time in order that Plaintiffs may ascertain their rights.  Such a declaration is also necessary and appropriate to prevent further harm or infringement of Plaintiffs' rights.

116.    The aforementioned acts and omissions of Defendant constitute a denial of full and equal access to and use of the City's pedestrian rights of way and have caused Plaintiffs to suffer deprivation of their civil rights.  As a direct and proximate result of the aforementioned acts and omissions, Plaintiffs have suffered and continue to suffer injury including *inter alia* denial of full and equal access to the City's pedestrian rights of way, isolation, segregation, struggling to surmount access barriers, fatigue, physical injuries, damage to wheelchairs and other mobility devices, and emotional distress including humiliation, anxiety, indignity and embarrassment.

117.    Plaintiffs have no adequate remedy at law for the harm to them arising from the conduct alleged herein.  Unless and until Defendant is preliminarily and permanently enjoined from engaging in such conduct, Plaintiffs will continue to suffer irreparable harm as a result of being denied full and equal access to public facilities, programs, services, and activities.

118.    Plaintiffs are entitled to declaratory and injunctive relief pursuant to each of the laws under which this action is brought.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs request judgment as follows:

1.    A declaration that Defendant's conduct as alleged herein has violated, and continues to violate, Title II of the Americans with Disabilities Act; Section 504 of the Rehabilitation Act of 1973; and California Government Code § 11135;

2.    Issuance of preliminary and permanent injunctions requiring Defendant to undertake remedial measures to mitigate the effects of Defendant's past and ongoing violations of Title II of the ADA, Section 504, California Government Code § 11135; and the regulations

promulgated under each of these statutes.  At a minimum, Defendant must be enjoined to take the following actions:

      a.      Undertake prompt measures pursuant to 28 C.F.R. § 35.151(c)(5) and California Government Code § 4452 to remediate non-compliant new construction and alterations to the City's pedestrian rights of way to bring them into compliance with the 2010 ADAS and the CBC;

      b.      Construct or remediate all non-compliant curb ramps at intersections on roads that were resurfaced or otherwise altered after January 26, 1992 to make those curb ramps compliant with the 2010 ADAS and the current iteration of the CBC;

      c.      Construct or remediate all non-compliant curb ramps at intersections on sidewalks that were constructed or altered after January 26, 1992 to make those curb ramps compliant with the 2010 ADAS and the CBC;

      d.      Remediate all damaged or deteriorated sidewalks, curb ramps, crosswalks and other elements of the pedestrian rights of way so that they are readily accessible to persons with mobility disabilities in compliance with the 2010 ADAS, without regard to whether such elements of the pedestrian rights of way are adjacent to privately owned properties;

      e.      Ensure that all future new construction and alterations to the City's pedestrian rights of way comply with the 2010 ADAS and the most recent iteration of the CBC, whichever is stricter in its requirements for disability access; and,

      f.      Remain under this Court's jurisdiction until Defendant fully complies with the Orders of this Court;

3.      Compensatory damages for the named Plaintiffs for violations of the ADA;

4.      Award Plaintiffs reasonable attorneys' fees, costs and litigation expenses; and

5.      Such other relief as the Court finds just and proper.

1    DATED: May 15, 2023                 Respectfully Submitted,

2

3                                   By:    /s/ Guy B. Wallace
                                        Guy B. Wallace (SBN 176151)
4                                       Mark T. Johnson (SBN 076904)
                                        SCHNEIDER WALLACE
5                                       COTTRELL KONECKY LLP
                                        2000 Powell Street, Suite 1400
6                                       Emeryville, California 94608
                                        Telephone: (415) 421-7100
7                                       Facsimile: (415) 421-7105

8                                       Catherine Cabalo (SBN 248198)
                                        PEIFFER WOLF CARR KANE
9                                       CONWAY & WISE, LLP
                                        4 Embarcadero Center, 14th Floor
10                                      San Francisco, CA 94104
                                        Telephone: (415) 766-3592
11                                      Facsimile: (415) 402-0058

12                                      Linda M. Dardarian (SBN 131001)
                                        Andrew P. Lee (SBN 245903)
13                                      GOLDSTEIN, BORGEN, DARDARIAN & HO
                                        155 Grand Avenue, Suite 900
14                                      Oakland, CA 94612-3536
                                        Telephone: (510) 763-9800
15                                      Facsimile: (510) 835-1417

16                                      Jinny Kim (SBN 208953)
                                        Rosa Lee Bichell (SBN 331530)
17                                      DISABILITY RIGHTS ADVOCATES
                                        2001 Center Street, Third Floor
18                                      Berkeley, CA  94704
                                        Telephone: (510) 665-8644
19                                      Facsimile:  (510) 665-8511

20                                      Attorneys for Plaintiffs and the Proposed Class

21

22

23

24

25

26

27

28